I'm I'm trying to come in there. I am I there? Yeah, you're there. All right. All right. Yes, you were early. I had my timer on. I'm sorry. How did I know? Okay. How did I know? But anyway, but glad you're on. Thank you. All right, sir. All right, counsel. You're up and on. Good morning, Your Honor, as I may please the court. My name is Alessandro Clark-Gonzani, and I represent Plaintiff Appellant. Okay, now you need to use your thespian drama voice. Of course, Your Honor. To make sure we can hear it up here, but as well to make sure everything is I represent Plaintiff Appellant Mr. Tyler Harrington, who's present with us today in court. The district court's opinion wholly omitted what is perhaps the most important fact in this case. Namely, when defendants entered Mr. Harrington's home and saw him and his wife asleep in their bed, they questioned out loud whether they were even at the right address, acknowledged out loud that they did not know, exited the home, and then without taking any steps whatsoever to confirm they're at the correct address, walked right back into the home with their guns drawn. May I ask a question? How did they know that this interchange occurred? Were they awake when you say they were asleep? How did they know that the deputy said, I think we're at the wrong address? Your Honor, we were able to review some body-worn camera footage and relied on that in drafting. And that's not incorporated in the record in any way, or is it? It's not in the record, Your Honor. The district court made this error of omission. Why? Your Honor, at this stage in the pleadings, we were under no obligation to include the video footage. It's severely invasive. It shows Mr. Harrington and his wife in their underwear. It's very traumatic. We recognize that at a later stage in this case, we'll be required for a court to evaluate the claims. But at this early stage, all that's required is a short and plain statement of the facts, which is what we provided. Okay. The district court made the error of omission of leaving out the second entry, where the defendants questioned aloud whether they were at the right home, because they relied on the facts as described in the defendants' briefings, which contradict Mr. Harrington's complaint, rather than the complaint itself. This is not a case involving a fast-moving situation in which officers needed to make a split-second decision. Defendants, in their own words, had everything under control. That's a quote. They had already secured the front and back exits of the home. They knew that the home that they were supposed to be responding to was unoccupied, and they had just seen the two people inside the home they incorrectly ended up in were fast asleep in bed. It was a calm situation. At that point, this court's clear-cut precedent obligated defendants to confirm the address before re-entering, and the district court's omission of the re-entry allegations alone is enough for this court to reverse. Is it your view that any mistaken home entry violates clearly established law, or only re-entry after officers recognize there's a serious risk of error? Our position is that the original entry was also unlawful, but that it is very obvious at the second point under Simmons and Garrison. And the reason the first entry was unlawful was because the clearly established rule is that officers need to make reasonable efforts to ascertain that the correct address before they enter. That's established in Garrison, Simmons, and applied by this court in multiple cases, including Hunt, Barnes v. Gerhardt, Barnes v. McClendon. That's the clearly established rule, reasonable efforts. And in this case, the officers failed to do that. They didn't make any efforts besides being told the address. They could have confirmed the address with dispatch. They could have waited for the homeowner, as they were instructed to do. They could have asked for a description of the home, which the 911 caller had provided and did not match Mr. Harrington's home. But the officers took no steps besides relying on the address. Defendants characterize this entry as a reasonable mistake, but it's not a reasonable mistake for three reasons. The first reason... Are you talking the first or the second entry at this point? I'm talking about the first entry. Okay. First, even if the officers had the correct address, they were only allowed to enter if they had a lawful basis to do so, and they lack that here. They did not have a warrant. They lacked consent, and they lacked exigent circumstances. Second, there were multiple reasons for the officers... Does the late night context factor into the exigency analysis? No, Your Honor. I don't believe that the late night would factor in at all. The facts present on the scene were very calm. They were responding to a call about a knock at the door. They, in their own words, said that the stage was under control. They had secured the front and back entrance of the home, and they saw that the people inside the home were fast asleep. It was an incredibly calm scene with no exigency. Moreover, they were responding to a call that had reported that there was a black truck at Mr. H's home, but there was no black truck at Mr. Harrington's home, which would be another reason for the officers to whether they were at the right house and know that whatever people had been there, perhaps earlier, were no longer there. Well, since the houses are just... I mean, everything in your complaint, which the county concedes is accurate, is that on a timeline, the dispatcher repeatedly told them the wrong address. And then the dispatcher herself got Mr. H and Mr. S confused and said, and now he says it's okay to secure the property. I just want to clarify some of the facts. Gave consent, in other words. Yes. I'd like to clarify a few points there. So Mr. H did not give the incorrect address initially. Mr. S gave the incorrect address. I understand that. And that was what the dispatcher repeatedly said to Kano and Lindsey. Dispatch gave that incorrect address one time before the defendants entered. The only time dispatch gave that address again was after they had held Mr. Harrington at gunpoint for a series of time and had independently determined that they were in the incorrect house, asked for the address. And then when dispatch gave the incorrect address, Mr. H immediately corrected himself and said what the correct address was. I mean, that's at Record of Appeal, page 18. Regarding the point in consent, it was clear that the defendants did not have consent in this case. And that's for three reasons. First is that they were told to wait for the homeowner to return before entering. And that's the message that dispatch communicated, that he was going to send his wife back to the house. They would like you to clear the house for them. Two, it's clear in context that the officers understood that this was conditional consent by their words and their behaviors. They did not immediately enter the home when they learned that the doors were unlocked. They first learned the back door wasn't locked, stated we're waiting for the homeowner, walked around to the front of the house, learned that the front door wasn't locked, and again stated they were waiting for the homeowner and that everything was under control. Those actions and words show that they understood that even though they could access the home whenever, they were supposed to wait for the homeowner. And they did not... Well, suppose this was my house and somebody or someone said that their suspicious truck was outside in the vicinity, call the cops. And the cops come and a homeowner has said, it's okay to come and clear the house. And the cops come, they think nobody's at home, but the front and the back doors are unlocked and there's been a report of a suspicious vehicle. Wouldn't it be reasonable to delay rather than to barge in and get attacked by a burglar in progress? Yes, Your Honor, it would be reasonable to delay in that circumstance. And if the officers in this case had delayed and waited for the homeowner as they'd been instructed, they would have realized. Not wait for the homeowner. They don't know, for all they know, the homeowner has arrived home, been tied up and is put in a closet or something. Well, those facts don't really reflect the facts in this case because when the officers did enter, they saw two people peacefully sleep in their bed. You also mentioned the truck. There was no to be seen because the truck reported was at Mr. H's home, not Mr. Harrington's home. So at the point when the officers re-entered and saw, they at the very least at that point should have questioned. Another reason to question whether they had consent is that that's not the reason the officers gave for their entry. They didn't say, oh, we walked in because we were asked by the homeowner. They said, when we see a door unlocked like that, we're going to come in. That's not a valid reason under the fourth amendment to enter the home. And what's important to emphasize is that the motion to dismiss stage, Mr. Harrington is titled to reasonable inferences in his favor. So to the extent this court believes it's ambiguous, whether the homeowner's statements granted consent, they should be interpreted in favor of Mr. Harrington. It could be that the homeowner wanted, and this is what the homeowner wanted, for the officers to wait for their return. And again, even if it had been clear unambiguous consent, once they saw the homeowner, once they saw Mr. Harrington and his wife asleep in their bed, they at that point had to question whether they could actually rely on that consent under Rodriguez. I'd like to discuss a little bit more the reason that it was not a reasonable mistake for the officers to enter the home. They had multiple reasons to question whether they were at the correct address. Defendant Lancaster had investigated the house across the street, knew the owner had left, knew that they were waiting for a homeowner to return and shared this with the other defendants. At a bare minimum, it would be an eyebrow-raising coincidence to be back to the same street across from the same house for the same conduct where the homeowner had also just left and was planning on returning. I also discussed the truck and how the truck wasn't there, despite being something that was reported that should have signaled to the defendants as well. And lastly, again, once they saw the couple asleep in bed, peacefully sleeping, that should have given them awareness that they were at the incorrect house and needed to immediately terminate the search because they'd been put on notice of the risk that they might be at the incorrect house. That's the clearly established rule under Simmons and Garrison. And at that point, they had to confirm the address and move forward. I'd like to turn to the excessive force claim at this time. It's clearly established that police officers cannot point a gun at a civilian who is non-threatening and compliant, particularly when the officers have no reason to be present in that person's home in the first place. This court suggested as much in Check ED Webb, and eight circuit courts agree on this point. Eight sister circuits have considered cases with similar factual patterns and have all found that it's excessive force to point a gun at a compliant person in a non-threatening situation. I could not find a published decision in the remaining circuits that is directly on point. This is a consensus that is enough to clearly establish precedent in this circuit. I'd like to draw the court's attention... What about the... Sir, can you address the Crane v. City of Arlington? Crane v. City of Arlington? I'm not sure whether it was... Well, it was... All right, I'll give you the site. It's 50F 4th 453. Passengers alleged psychological injury when officers pointed guns at them and entered a car to urge the driver to turn off and exit the car. Officers were entitled to qualified immunity on the excessive force claim because pointing the gun was not an unreasonable use of force. And I'm sorry, Your Honor, was that case cited in the briefings? It's not ringing a bell for me. Well, it's the law in the Fifth Circuit, so whether it was... It was our independent research. And can you remind me again what the facts that justified the stop were again? I'm not doing the oral argument you are. The case is Crane v. City of Arlington 50F 4th 453. If you choose to do a 28J letter, that's up to you. Your Honor, I apologize. I'm not familiar with that case. I am familiar with other cases in the circuit where the court has held that pointing a gun is not excessive force. But in those cases, the facts are very different. They typically involve a suspect who's resistant or otherwise non-compliant or a dangerous situation. Well, is there a case that clearly establishes that pointing a gun during a mistaken home entry without physical injury constitutes excessive force? I think Reed v. Campbell out of the Sixth Circuit is almost directly on point in that. It was a case where the officers had no right to be inside the plaintiff's home. I don't believe it was a mistaken entry, but it was one where they exceeded. I think it was they were trying to arrest someone and they had no lawful reason to be present at home. Aside from that case, anything in our circuit? There's nothing in this circuit, but there are cases from other circuits that establish that broad proposition that it's excessive force to point a gun at a compliant non-threatening person. And again, eight circuits have ruled on that question and they've all come out the same way in that regard. Defendants also claim that the psychological injuries are not enough, but that's directly contradicting with this court's precedent. The psychological injuries that Mr. Harrington suffers are severe and ongoing. It's not just the momentary distress he experienced during the incident. He suffers anxiety. He has difficulty sleeping. He's a gun owner who is fearful to carry his weapon around for what might happen if he interacts with the police at that time. It's very different from other cases in this circuit. I'd really like to just end by emphasizing that at the point when defendants walked in and saw the couple asleep, they knew that there were no exigent circumstances. The scene was calm. They knew that they were at the wrong house. They said as much as out loud. The question was, did they give us the right address? Kenna responded, I don't know. And at that point, this court's precedent required them to make additional efforts. Thank you. All right. Counsel, you've reserved your rebuttal rights. Mr. Burnett. Good morning. May it please the court. My name is Gregory Burnett. I represent the police, in this case, the Harris County deputies. We ask that you respectfully, this court respectfully, affirm the district court's dismissal under the 12B6 rule because the complaint failed to plausibly allege a constitutional violation. In any event, the deputies are entitled to qualified immunity. This case arises from an unfortunate mistake. The deputies responded to a report of suspicious activity at a residence in Harris County. They were dispatched with information indicating consent to enter and investigate. Relying on that information and believing they were at the correct address, they entered what turned out to be the wrong home. They encountered the plaintiff and his wife in bed. Briefly detained them at gunpoint while securing the scene and realized the address discrepancy. Once they realized the address discrepancy, they quickly left after verifying that those were the correct homeowners. The district court dismissed those claims concluding that the deputies' conduct was objectively reasonable in light of a reasonable mistake, a fact, and that qualified immunity applies. That decision of the district court should be affirmed for two reasons. First, the complaint does not plausibly allege a Fourth Amendment violation. Second, if it did, the law was not clearly established in a way that would have put every reasonable officer on notice that this conduct was unlawful. I'll address each in turn. There is no plausible Fourth Amendment violation. Under Rule 12B6, the court accepts well-pleaded facts as true, which the district court did, but it does not accept legal conclusions. The question is whether taking the facts alleged the deputies' conduct was objectively unreasonable under the Fourth Amendment. The Supreme Court has repeatedly emphasized that the Fourth Amendment permits reasonable mistakes of fact. This case clearly falls within that framework. According to the complaint itself, the deputies were responding to a report of suspicious activity. They were dispatched with information indicating that consent to enter had been obtained. They believed they were at the correct address. There is no allegation that they had fabricated consent or that they ignored contradictory information or that they deliberately entered the wrong house. At most, the complaint alleges that the deputies were mistaken. Well, once the officers opened the bedroom door and saw the Harringtons asleep and apparently said aloud, though it's not in the record, but I guess maybe if this case proceeds, it would be, did they give us the right address? What then was the lawful basis for reentering the house without first verifying the address? So, again, the officers, the information they had leading up to that point was that there was a suspicious individual, suspicious persons around in that area. It was after midnight. The officers making those decisions, they are entitled to make split-second decisions even though looking at hindsight, they may have not made them. Well, assume the first entry was reasonable. What justifies the second entry after they exited and had time to confirm the address? Yes. The second entry, again, officers, they don't know who those individuals are. The information that they had was that no one is supposed to be in the home. They assumed that they was at the correct owner's home who made the call to the dispatcher. So, officers have a duty to preserve property, preserve life if life was in there, although I know that the complaint states that Mrs. H had left the home and she was on her way back. Those officers had no way of knowing if Mrs. H had made it back home, whether she was in that home anywhere. All those officers knew is what dispatch told them, and what they knew was, yes, Mrs. H was on her way back home, and also they knew no one was supposed to be in the house, and they also knew that the doors were supposed to be locked. They found this house with doors unlocked. After midnight, a suspicious person in the area, that justified those officers to re-enter, and my understanding from the complaint, they actually stood at the door. They didn't actually go back to the bedroom. They knocked on the door somewhere right there by the door. So, this court has long recognized that officers must, as I said, make those split-second judgments in fluid circumstances. Let me ask you this. I mean, you've argued that the complaint, you know, it's 12B6, but I mean, we get a lot of complaints filed, often pro se, sometimes prisoners, sometimes bare bones, amendments, and all kinds of stuff in the iterations. In this instance, it looks like counsel opposite over there is the one who drafted the complaint. It's 18 pages. It's got subparts. It alleges, you know, the essentials of the violations, et cetera, et cetera. You know, we're still on notice pleading, you know, under the federal rules, not like state court. It's definitely not bare bones like a lot of things that we do see, and so my question to you, you know, is like, what's he supposed to do? I mean, he's got photos in here, a diagram at least, and it's at least facially, you know, alleging what occurred, the violation, citing the statute, citing, you know, the Constitution. I mean, his duty is not to prove his case through the complaint. Now, if this case came to us on summary judgment, it's a whole different discussion. You know, what's in the summary judgment record, you know, et cetera, et cetera, if it was bare bones and kicked out and he didn't amend it and all that, but I'm just saying, you know, it's 20 pages. It lays out the who, what, why, when, and where. Now, counsel opposite's argument was that the district court did not construe the allegations in the light most favorable to him as the pleader, and that's a key ingredient in the analysis, and so my question to you is, you know, just looking at it without judging the merits of it and all that, what is so deficient for 12b6 purposes of affirming the dismissal just facially based on it, you know, does allege what happened, you know, cites the Constitution, et cetera, et cetera. I mean, what's just, what? I mean, I know. Facially, your honor, the complaint, and I can point you to the record and what's cited in the complaint. Again, plaintiff's own complaint will show that the officers had consent to enter the residence. If you look at the record on page 13, the dispatcher said that. No, no, no, that's not what I'm asking. This is a 12b, isn't it? It is, your honor. All right, so I'm just asking because I'm sitting here with the complaint in my hand, and I'm looking at all 18 pages, all the subparts and so forth, and I'm just asking for 12b purposes. The dismissal, what's facially deficient about the complaint such as, you know, pouring it out at this stage. Counsel makes an argument that the court did not construe it in favor. That's what I'm asking. As I said, we get a lot of them that, you know, they're tattered, they're this to that, they're not amended, et cetera, but just when I read it initially, I'm not taking a view on whether they're meritorious, but just in touching first, second, and third to get the home plate to the next stage, what's your best case that what's alleged here is just so deficient that it ought to be bounced? Yes, your honor. I would disagree that the district court then took the defendant's facts. Yeah, and I'm not saying that they did. I'm just strictly on the paper for now. And on the paper, I would say that even with the facts that are pled, a constitutional violation wasn't plausibly pled based upon the facts that they alleged in the complaint. And those facts that are alleged in the complaint is that the officers did have some consent, and they were acting off what the dispatcher said, and they reasonably made a mistake based on what the dispatcher had laid to them. There is one state, okay, anyway, I'm trying to stay on the complaint because I really want to say once they get in and see people sleeping, I mean, where does common sense creep into the calculus, you know, of what hardly look like they're committing a burglary if he's snoring or whatever in his bed? I don't mean to make light of it, but as Judge Willis said, I mean, once, you know, come in and realize the facts there. Yes, your honor. I don't know if it was alleged that the individuals were snoring or they could tell. That was, I would be interested, and I'd take that back. I didn't mean that. But nobody's claiming that they couldn't tell if the person was asleep or not, right? Yes, they did enter this home, saw that some individuals were in the bed that appeared to be asleep to them. Again, they didn't know if they were definitely asleep, but they appeared to be asleep, so they backed out of the home. At that point, that could be officer's training. It could be a safety issue. They still wouldn't just abandon a home because they saw someone in their sleep. Again, this is supposed to be the college, the 911's college home, and that's why they did at some point still reach back out to dispatcher and ask them, hey, are we in the right home? Although, that was after the fact, after they got the plaintiffs out of the bed. But they did, they still had concerns of whether they were in the correct home. Again, the only information that they were working off of, it wasn't from Mr. H. It wasn't from Mrs. H. It wasn't from the neighbor. It was from the dispatcher. They were only relying on the information that they received from the dispatcher. I guess, and again, my question isn't to suggest that they are ultimately culpable for what happened. I'm just still at the 12B stage, facing that it just, I'm just asking. That's why we grant oral argument to say, it's notice pleading. Sure, if you file under 1983, you got to do more than say your name, but just looking at it in terms of citing the statute, citing the constitution, setting forth what transpired, et cetera, et cetera, I'm just at least quizzical of what on its face, on that alone, not who should be held responsible, all of those go further down the inquiry. Well, I would say that- Well, let me, can I interject here? Sure. Judge Stewart, would you be offended? No, ma'am, I won't. You know I won't. Well, let's move on to what the pleadings say that's relevant to qualified immunity. First of all, not much time is elapsing throughout these events. Second of all, qualified immunity is based on the idea that clearly established law, clearly established law says that police who have, who have, does clearly established law say that police who have reason to doubt whether there is, whether they have entered properly cannot stand at the threshold and yell at the people and get them to come out and identify themselves to be sure that there hasn't been improper incursion into the house. So, I guess that, similar to what Judge Willett asked plaintiff's counsel, where is the clearest, and that's just on the face of the complaint. I would submit, Your Honor, that it wasn't clearly established that the officers could not have done what they'd done. And I think on the face of the complaint, they did not allege a clearly established law that these deputies had violated. It's not clearly established that deputies relying on the dispatcher information enters a house suspecting that they're going into the correct house on mistaken information. It's not clearly established that that's unlawful. And I don't think that the plaintiffs identify any case that's on say that that was, it was clearly established and that officers should have been put on notice that the law was clearly established in this incident. Now, there wasn't, I mean, it is true, is it not, that on the second incident, I think Officer Lancaster entered from the back of the house. In other words, the one fellow did stand in the threshold, so technically he probably didn't enter, but the other fellow came in at the back, did he not? Yes, Officer Lancaster entered in at the back after the plaintiffs got out of the bed. He made visual, he saw visual, saw individuals walking in the room, and that's when he entered from the back. So there was a, so there was a second entry by an officer. There was. Okay. Do you want to say anything about excessive force? Yes, Your Honor. As far as the excessive force, the plaintiffs alleged that the force was excessive because of the gun pointing. And again, the governor's standard under that would be reasonableness. That would be up under the Graham case. The court has consistently held that pointing firearms and briefly detaining occupants while officers secure a scene does not automatically constitute excessive force, particularly where officers are investigating potentially dangerous activity. The reasonableness inquiry considers the severity of the suspected offense, whether the suspect poses an immediate threat, and whether he is actively resisting. Although there was not any active resistance here, but there was a severity of the offense here, which could have been a possible burglary, which would be a felony. Also, the officers were not aware whether these individuals would have posed any type of immediate threat. Only thing they were aware of that these individuals were not supposed to be in this home and the doors were unlocked and they were supposed to be locked. And again, this occurred after midnight. Again, there was a, it was objectively reasonable for the officers to enter that home with their weapons out based upon the circumstances and the facts that were presented to the deputies at that time. And again, even assuming if these officers committed some type of constitute, identified some type of constitutional violation, again, it wasn't clearly established they would be entitled to qualified immunity based upon the facts in this case. And that is all I have at this time, Melissa. All right. All I'll say is, is learning as long as Judge Horty's been on the bench, he doesn't say anything about any of that. I'm sorry. The appeal is from the judgment, it's not from the reasons, but he don't say anything about that. He says they made a mistake. It was excusable. No excessive force. Is that what he says? So I'm just reading and writing what's here, not taking a position, but I'm like, really? That's what it says. They were entitled to make a mistake and they were excused. That's what he says in his reasons. He doesn't say qualified immunity. He doesn't say no citation of this. He doesn't say any of that. He pours it out on a 12B6, on those conclusions. That's all I got to say. We take the case. I'll take a pace and just look at it closely, but you have ably represented the county in your briefing and argument. We appreciate the responses to all the court's questions. All right. Thank you, Your Honor. Thank you, sir. All right. All right, counsel, you're back on the boat. I'd like to just start with what Judge Willett said about the statements about being unsure, not being in the record. They are in fact- I've got 20-20 hearing, but I still can't hear you. It is in fact in the record. At Record of Appeal 16, this is a direct quote, Defendant Lindsey whispered, there's someone asleep on the bed. Did they give us the right address to which Defendant Canna whispered? I don't know, just because we don't have the video evidence. It is in the record. And I want to- Well, to be honest, to be honest, Mr. Clark Consani, I read that as if assuming that did come from a body cam, then I'm wondering why you didn't put in the whole body cam, which is what we normally see on these kinds of cases. But go ahead. If the defendants felt that our description didn't accurately represent the facts, they could have attached the body camera and it would have been incorporated, but they did not do that, which reflects the veracity of those claims. I also wanted to address that Defendant's Council conceded that defendants had concerns whether they were in the wrong home. And under Simmons, that is the clearly established law. Simmons says that when officers are put on notice of the risk that they might be in the incorrect address, they must terminate the search. That is what Simmons holds. And it makes clear that qualified immunity does not provide a safe harbor for police to remain in a residence after they're aware that they've entered the wrong residence by mistake. That's a quote from Simmons. I think it's also worthwhile addressing some of the other misrepresentation of the records below. This was not a fact situation that called for split second decisions. They had seen the people peacefully asleep in bed. There's nothing in the record to suggest that they were not sleeping in bed and at this stage were entitled to inferences. They had secured the front door. They had secured the back door. They had three officers on the So this was not a circumstance calling for split second decisions. They did know whether Mrs. H was home because they were standing outside. You can look at Record of Appeal 13 and 14 to see that the officers were immediately dispatched. And by the time Lancaster returned, the other officers were already there. There's nothing in the record that suggests that the officers knew that the doors were supposed to be unlocked. That is something that the defendants included in their complaint and this court must disregard at this stage. There's nothing in the record, like I said, to suggest that they weren't asleep. I thought Mr. H had said that his wife had locked, well actually when Lancaster was at their house, the doors were locked. I don't believe that that's stated in the record. All that's stated in the record is that Mrs. H said that she was going to leave the house. She didn't say that she was going to leave the house and lock the doors, or at least that's not in the complaint. Well, when you think you've just had an intruder, well, whatever, that goes to reasonableness. Okay. And again, we're entitled to inferences in our favor at this point. So if it's not stated in the complaint, those facts... Well, you don't have an inference against qualified immunity. You have to plead facts that if proven would demonstrate they didn't have qualified immunity. Of course, and I'd like to turn to the qualified immunity prong, specifically on the entry and the mistake of entry. So the way that this court has applied the qualified immunity clearly established inquiry in that context is asking whether or not the officers had consent. So for example, in Smith v. Lee, this court dealt with a similar situation where there was a factual dispute about whether there was consent. They found that there was no consent based on the plaintiff's version of the facts and held that that violated the clearly established rule that you can't enter a home without consent. They didn't look for super specific facts of the way in which the consent was given. Similarly, in Hunt v. Tomplake or Hart v. Barnes or Hart v. McLendon, this court applied the clearly established rule that officers need to make reasonable efforts to ascertain the correct entering. They didn't look for the exact same reasonable efforts. In fact, the efforts made were different and fact specific in every case. But they applied the clearly established rule that officers need to make reasonable efforts. And I just want to again reiterate all the reasons that by the time the officers saw the two people asleep in bed, they knew they were at the wrong house. Defendant Lancaster had spoken to the person across the street, knew she had left, knew she was planning on returning. Then they didn't see the truck that had been reporting. Then they walked inside and saw the two people asleep in bed. Cumulatively, all of those facts need to be considered when understanding what the officers reasonably should have known along with their fact that they admitted out loud that they did not know. For those reasons, we ask that this court vacate the district court's opinion and reinstate all the claims against defendants. Thank you. All right. Thank you, sir. Thank you, counsel, on both sides. It's a very interesting case, put it mildly. But we appreciate the briefing and especially responsiveness to the court's questions. The case will be submitted along with the balance of the cases that this panel has heard this week. Having said that, the panel will stand adjourned.